**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 15-2471**

───────────────

FERNANDO CONTRERAS ALCALA,

Plaintiff - Appellant,

v.

CLAUDIA GARCIA HERNANDEZ,

Defendant - Appellee.

───────────────

**No. 15-2507**

───────────────

FERNANDO CONTRERAS ALCALA,

Plaintiff - Appellee,

v.

CLAUDIA GARCIA HERNANDEZ,

Defendant - Appellant.

───────────────

Appeals from the United States District Court for the District of South Carolina, at Florence.   R. Bryan Harwell, District Judge. (4:14-cv-04176-RBH)

───────────────

Argued: March 22, 2016              Decided: June 15, 2016

───────────────

Before KING, AGEE, and FLOYD, Circuit Judges.

───────────────

Affirmed by published opinion. Judge Floyd wrote the opinion, in which Judge King and Judge Agee joined.

_____

**ARGUED:** Matthew Adams Abee, Thomas William McGee, III, NELSON MULLINS RILEY & SCARBOROUGH LLP, Columbia, South Carolina, for Appellant/Cross-Appellee. Kevin Roger Eberle, EBERLE LAW FIRM, LLC, Charleston, South Carolina, for Appellee/Cross-Appellant. **ON BRIEF:** Brendan P. Barth, Nicholas W. Lewis, BARTH, BALLENGER & LEWIS, LLP, Florence, South Carolina, for Appellee/Cross-Appellant.

_____

FLOYD, Circuit Judge:

In June 2013, Appellee Claudia Garcia Hernandez (Mother) removed her two minor children from their home in Mexico. Mother crossed into the United States with the children and arrived in South Carolina in August 2013. In October 2014, the children's biological father, Appellant Fernando Contreras Alcala (Father), petitioned for return of the children to Mexico pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention"), Oct. 25, 1980, T.I.A.S. No. 11670, 19 I.L.M. 1501. The district court found that Mother's removal of the children was wrongful under the Convention, which would ordinarily require the district court to order the children returned to Mexico. The district court further found, however, that the children were now settled in their new environment and that the Convention did not require a return order under the circumstances. The district court declined to order the children returned, and Father appealed. We conclude that the district court correctly applied the Convention and therefore affirm.

I.

The underlying facts are drawn from the order of the district court, which was entered subsequent to a bench trial.

3

A.

Father, Mother, and both minor children, F.C.G. and A.C.G., are Mexican nationals. Although Father and Mother were never married, in early 2013 they were living together with the children in Cosolapa, Oaxaca. At that time, the children were approximately eight- and two-years old, respectively.

Mother began discussing with Father her desire to move with the children to the United States. Father, however, did not want to move to the United States. On June 17, 2013, Mother took the children, without telling Father, and went to a relative's home in a neighboring town. The next day, Father complained to the local authorities. He informed the authorities that Mother had expressed a desire to move to the United States and that Mother had family already living there.

Mother, with the assistance of family and friends, made her way with the children to the border. She and the children entered the United States without authorization around July 2, 2013. Mother and the children subsequently arrived in Florence, South Carolina, on August 22, 2013. Mother's mother and two sisters had previously settled in Florence after entering the United States without authorization sometime in 2004 or 2005. The sisters completed schooling through high school in Florence. Both sisters own and operate small businesses in the area, as does their mother. The sisters participate in the Department of

4

Homeland Security's Deferred Action for Childhood Arrivals (DACA) program.[1]

                                    B.

Mother and the children initially lived with her mother in Florence. Within a short time, Mother enrolled the older child, F.C.G. (Son), in the third grade at Greenwood Elementary. The younger child, A.C.G., was not old enough to attend school. Neither Mother nor Son spoke English when they arrived, and one of Mother's sisters helped register Son for school. During this time, Mother worked for her mother and sisters. Sometime in 2013, Mother met her current boyfriend, Jose Vasquez (Vasquez).

In January 2014, in order to have more space, Mother and the children moved out of her mother's home and into a mobile home owned by one of Mother's sisters. Their new home was in neighboring Darlington County, South Carolina. Upon moving, Mother withdrew Son from Greenwood Elementary and enrolled him at Brockington Elementary in Darlington on February 4, 2014. That same month, Vasquez moved in with Mother and the children.

---

[1] DACA does not confer formal immigration status. As currently implemented, the program permits participants to defer removal and remain in the United States if they meet certain conditions. See, e.g., Arizona Dream Act Coalition v. Brewer, No. 15-15307, __ F.3d __, 2016 WL 1358378, at *1-*2 (9th Cir. Apr. 5, 2016).

Son completed the 2013-2014 school year at Brockington Elementary. He was absent from school eight days during the spring term. Son made decent grades and worked with the English for Speakers of Other Languages (ESOL) program.

In November 2014, Mother, Vasquez, and the children moved to their current home, a mobile home owned by Vasquez's father in Darlington County. The location of their new home required Mother to transfer Son to another Darlington school, St. John's Elementary.

C.

On October 27, 2014, Father filed a petition in district court, seeking the return of the children to Mexico under the Hague Convention. Father argued that when children under the age of 16 have been wrongfully removed from their country of habitual residence, the Convention requires the country to which the children have been brought to promptly order their return.

On January 5, 2015, Father and Mother filed a joint stipulation of facts. The stipulated facts established that Mother had wrongfully removed the children from Mexico, their state of habitual residence. On February 4, 2015, Mother filed an answer to Father's petition. Mother asserted that certain exceptions to the Convention's general rule of return were applicable here. Specifically, Mother argued that: (1) Son was

6

now settled in his new environment in South Carolina; (2) Son was a mature child who objected to his return; and (3) the children faced grave risk if returned.

The district court held a bench trial on May 11 and 12, 2015. The district court heard testimony from Father, Mother, Mother's mother and two sisters, Vasquez and his father, one of Mother's friends from church, and several of Son's teachers and school officials. Son also underwent a forensic interview, which was reviewed by the district court.[2]

Following trial, the district court issued an order enumerating its factual findings relevant to the issue of whether Son was now settled in South Carolina. The district court noted that Son's forensic interview indicated that Son can speak, understand, and converse in English. The district court characterized this fact as "significant evidence of his acclimatization to his new environment given the fact that he could not speak any English when he arrived in August of 2013." J.A. 442. With regard to Son's academic performance, Son's most recent report card showed that he received all As and Bs except

---

[2] A.C.G. was not interviewed because of his young age. On the second day of trial, the parties informed the district court that they did not want the children to be separated. To that end, the parties stipulated that whatever decision the court made concerning one child would apply to the other. For a variety of reasons, this resulted in the trial focusing on the application of the Convention to Son's circumstances.

7

for one C in his Science and Math class in the first term of the year. Son's English teacher testified that Son has a good grasp of the language and was expected to receive an A at the end of the current term in his English and Language Arts class. Son is enrolled in the ESOL program, although Son's English teacher testified that Son does not receive any of the special accommodations generally afforded to ESOL participants. The district court described Son as "perform[ing] exceptionally well in school." J.A. 443.

The district court found that Son has substantial family ties in his new environment, with a number of family members living nearby including his grandmother, two aunts, and several cousins. The district court found that Son has extensive contact with those family members and attends numerous family gatherings. The district court also found that the family has strong ties to the local community through successful ownership and operation of various local businesses. The district court credited testimony that Mother and Vasquez are in a stable, loving relationship and that they eventually plan to marry. Son regularly attends church, and the district court credited testimony that he gets along well with the other children and has friends at the church. The district court also found that Son has friends elsewhere in his new environment. One of Son's teachers testified that Son is well-liked by his peers and has a

8

number of friends in class. Evidence also showed that Son plays with other children in his neighborhood.

The district court further found that despite Mother's admitted unauthorized presence in the United States, and her concomitant lack of legal authorization to work, Mother has remained gainfully employed and consistently earned an income since her arrival. The district court found that Mother "is clearly able to provide for the minor children" and that the children were always provided adequate clothing, food, and shelter. J.A. 444. Mother's mother and sisters also testified that they would be willing to help Mother and the children financially if needed.

With respect to Son's home life, the district court found that Mother had maintained a stable residence in Son's new environment. Although the evidence established that she had lived with the children in three different homes in roughly fourteen months, each home was in the same general area in South Carolina and the moves did not disrupt the children's daily lives. The district court found that Mother's reasons for moving each time were reasonable, and did "not reflect an unstable existence" for Son or an attempt to conceal his whereabouts. Id. The district court found that Son "ha[s] a stable home life in [his] new environment." Id.

9

Both Mother and Vasquez are present in the United States without authorization. They have both been arrested for traffic violations. Mother lacks legal authorization to work in the United States, and she conceded that she pays no taxes on the income she earns. Neither Mother nor Vasquez has ever been subject to deportation proceedings. The district court found Son's own immigration status a "cause for concern," but noted that "as a practical matter, it is highly unlikely that [he] will face deportation anytime soon." Id. The district court further noted that several of Son's relatives had lived in the area without legal authorization for an extended period of time; despite the lack of authorization, they "operate local businesses and make positive contributions to the community." J.A. 445. The district court concluded that there is nothing to suggest that Son's immigration status "is likely to upset the stability of [his] life in [his] new environment" and further found that there was no indication that Son was "likely to suffer any harm from [an] inability to receive certain government benefits." Id.

The district court found that the children "are well-cared for, have access to medical care, and are supported by a network of family and friends." Id. The district court characterized the factual record as containing "strong evidence that the minor

10

children are well-settled in their new environment" and, "by all accounts, are thriving." J.A. 453.

The district court then addressed Mother's argument that the Hague Convention did not require it to order Son's return because he was now settled in his new environment. The district court agreed that the Convention did not require it to order Son returned if Mother established that Son was settled. The district court noted that the Convention does not define what it means for a child to be "settled." The district court therefore looked to the totality of the circumstances to determine whether Son was connected to his new environment such that an order to return him would be harmfully disruptive. The district court ultimately concluded that a preponderance of the evidence established that Son was now settled in his new environment. Consistent with that conclusion, the district court declined to order the children returned to Mexico.[3]  Father now appeals.

---

[3] With respect to Mother's other arguments against return, the district court concluded that Son was not sufficiently mature such that his objection to return should be taken into account, and further concluded that Mother had failed to establish that the children would face grave risk if returned. Mother has cross-appealed the district court's decision on Son's maturity. Because we affirm the district court's decision not to order Son's return under the Convention's "now settled" exception, we need not address Mother's alternative argument and we dismiss her cross-appeal as moot.

11

II.

We review the district court's findings of fact for clear error and review its construction and application of the Hague Convention de novo. Maxwell v. Maxwell, 588 F.3d 245, 250 (4th Cir. 2009); Miller v. Miller, 240 F.3d 392, 399 (4th Cir. 2001).

III.

A.

"To address 'the problem of international child abductions during domestic disputes,' in 1980 the Hague Conference on Private International Law adopted the [Hague Convention]." Lozano v. Montoya Alvarez, 134 S. Ct. 1224, 1228 (2014) (quoting Abbott v. Abbott, 560 U.S. 1, 8 (2010)). "The United States ratified the Hague Convention in 1988, and Congress implemented the Convention that same year through the International Child Abduction Remedies Act (ICARA)." Id. at 1229 (citing 102 Stat. 437, codified at 22 U.S.C. §§ 9001-9011).

A primary aim of the Convention is to deter parents from taking children across international boundaries in search of a more sympathetic court to resolve custody disputes. See Miller, 240 F.3d at 398. To that end, the Convention's central operating feature is the "return remedy": when a child under the age of 16 has been wrongfully removed from his or her country of habitual residence, the country to which the child

12

has been brought generally must order the prompt return of the child. Abbott, 560 U.S. at 9.

Importantly, the return remedy does not alter the pre-existing allocation of custody rights between parents; the Convention generally leaves ultimate custodial decisions to the courts of the country of habitual residence. Id. "The Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence." Id. at 20. The return remedy, in effect, "lays venue for the ultimate custody determination in the child's country of habitual residence rather than the country to which the child is abducted." Lozano, 134 S. Ct. at 1228.

However, "[t]he return remedy is not absolute." Id. at 1229. The Convention provides a limited number of narrow exceptions to the general rule of return. Miller, 240 F.3d at 398-99, 402. One such exception is found in Article 12 of the Convention. Article 12 states the general rule that where appropriate proceedings are commenced within one year of a child being wrongfully removed, a court "shall order the return of the child forthwith." Convention, art. 12, 19 I.L.M. at 1502. Article 12 further provides that even if this one-year period has expired, a court shall nevertheless order return "unless it is demonstrated that the child is now settled in its new

13

environment." Id. In other words, the Convention does not require a court to order a child returned if the action under the Convention was not commenced within one year of the abduction and the child is now settled in her or his new environment. See Miller, 240 F.3d at 402 n.14.

## B.

Father does not dispute that the one-year period elapsed before he commenced this action. Whether the Convention requires that Son be ordered returned to Mexico thus turns on whether Son is now settled in his new environment. Under ICARA, Mother bears the burden of establishing that Son is settled by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B).

## 1.

ICARA mandates that courts "shall decide" cases "in accordance with the Convention." 22 U.S.C. § 9003(d). The Hague Convention, however, does not define what it means for a child to be "settled." See Lozano v. Alvarez, 697 F.3d 41, 56 (2d Cir. 2012), aff'd in part sub nom. Lozano v. Montoya Alvarez, 134 S. Ct. 1224 (2014). We have not yet construed the term "settled" in the Convention, although other courts have had occasion to do so.

14

In Lozano, the Second Circuit began by noting that the natural meaning of the term "suggests a stable and permanent relocation of the child." 697 F.3d at 56. The court also noted that a report prepared by the official Hague Conference reporter for the Convention, Elisa Perez-Vera, cautioned against allowing Convention exceptions to swallow the basic rule of return: "[exceptions] are to be interpreted in a restrictive fashion if the Convention is not to become a dead letter." 697 F.3d at 52, 56 (quoting Perez-Vera Report ¶ 34). Accord, e.g., Miller, 240 F.3d at 402 (explaining that the exceptions to return under the Convention are "narrow").[4] Consistent with this principle, the Department of State has interpreted "settled" to require "substantial evidence of the child's significant connections to the new country." Lozano, 697 F.3d at 56 (quoting Department of State, Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (Mar. 26, 1986)). In light of these various considerations, the Second Circuit concluded that "settled" in this context means "that the child

---

[4] The Supreme Court has noted that the Perez-Vera Report is often cited by courts interpreting the Hague Convention, but that it remains an open question whether the Report is entitled to any greater weight than general scholarly commentary. Abbott, 560 U.S. at 19. We need not answer that question now, as we accord no special weight to the Report. The Report is consistent with a variety of sources all counseling the same construction of the "settled" exception.

has significant emotional and physical connections demonstrating security, stability, and permanence in its new environment." Lozano, 697 F.3d at 56.

The Second Circuit's approach to treaty interpretation in Lozano is consistent with our own.[5] We find the analysis in Lozano to be persuasive, and thus agree that for a child to be settled within the meaning of the Convention, the child must have significant connections demonstrating a secure, stable, and permanent life in his or her new environment. Accord, e.g., Hernandez v. Garcia Pena, No. 15-30993, __ F.3d __, 2016 WL 1719955, at *4 (5th Cir. Apr. 28, 2016) (citing with approval to the Lozano analysis).[6]

---

[5] When a treaty does not define an operative term, we turn to other sources for guidance, including judicial constructions, history, and the purpose of the treaty, as well as the meaning attributed to the term by government agencies charged with the treaty's negotiation and enforcement. See Ordinola v. Hackman, 478 F.3d 588, 595 (4th Cir. 2007); United States v. Al-Hamdi, 356 F.3d 564, 570 (4th Cir. 2004).

[6] Some courts have characterized the "settled" analysis as asking whether, "at least inferentially, return would be disruptive with likely harmful effects." In re D.T.J., 956 F. Supp. 2d 523, 534 (S.D.N.Y. 2013) (citations omitted). This is functionally the same standard as we articulated above. Ordering a child's return will generally sever whatever immediate connections a child has to his or her new environment. If those connections are significant enough that the child's life is secure, stable, and permanent, a return order is likely to be harmfully disruptive.

16

2.

The Convention and ICARA are also silent regarding what facts a court should consider in making a "settled" determination. See Lozano, 697 F.3d at 56. The text of the Convention does not place any limits on the categories of evidence that a hearing court may consider. Given the lack of any textual limitation, courts should consider any relevant circumstance that demonstrates security, stability, or permanence—or the lack thereof—in a child's new environment. Such a totality-of-the-circumstances analysis serves the purpose of the "settled" exception and is consistent with the analytic approach in decisions of our sister circuits. See, e.g., Hernandez, __ F.3d __, 2016 WL 1719955, at *4; Lozano, 697 F.3d at 56-57; In re B. Del C.S.B., 559 F.3d 999, 1009 (9th Cir. 2009); Lops v. Lops, 140 F.3d 927, 946 (11th Cir. 1998).

We note that the more recent of these decisions have tended to enumerate various factors a court should consider in making a "settled" determination. The district court here looked to the factors articulated by the Second Circuit in Lozano:

> (1) the age of the child; (2) the stability of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child attends church [or participates in other community or extracurricular school activities] regularly; (5) the respondent's employment and financial stability; (6) whether the child has friends and relatives in the new area; and (7) the immigration status of the child and the respondent.

17

697 F.3d at 57. The district court correctly recognized that such factors are non-exhaustive, and in a particular case some of these considerations may not apply and additional considerations may be relevant. Additionally, there is no formulaic way to tabulate or weigh any particular factor or circumstance. Thus, while we agree that the use of such factors may be helpful in guiding factual development and analysis, their use should not obscure the ultimate purpose of the court's inquiry. This inquiry is, as explained above, a holistic determination of whether a child has significant connections demonstrating a secure, stable, and permanent life in his or her new environment.[7]

Before turning to consider whether Son's circumstances establish that he is now settled, we stress that the "settled"

---

[7] In her brief, Mother argues that "the trial court's findings on the presence of each factor should be reviewed for clear error." Appellee's Br. 11. This is not correct. We need not independently review such "findings," because the "presence" or "absence" of a factor does not have a meaningful, independent effect. Likewise, a district court does not err if it declines to assign each underlying fact to a specific factor or factors. There is at bottom here a single legal question for the district court to answer, and for us to review: "Is Son now settled?" We review this ultimate issue de novo. See Miller, 240 F.3d at 399; In re B. Del C.S.B., 559 F.3d at 1008 ("[A] conclusion as to whether a child is 'settled' in her new environment, though fact-specific, ultimately rests on a legal determination of whether the discrete facts add up to a showing that she is 'settled' within the meaning of Article 12." (quotation omitted)).

18

analysis should not be transmuted into a consideration of a child's best interests. Courts often use a "best interests of the child" standard in custody disputes, but we are <u>not</u> resolving a custody dispute. "The Convention and [ICARA] empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4); <u>see also, e.g.</u>, <u>Friedrich v. Friedrich</u>, 78 F.3d 1060, 1067 (6th Cir. 1996) ("[The Convention's exceptions] are not a basis for avoiding return of a child merely because an American court believes it can better or more quickly resolve a [custody] dispute."). A court determining whether a child is settled must focus on the significance of the child's connections to her or his new environment; it should not compare the child's current situation with her or his prior situation or expected situation if returned.[8]

---

[8] The Convention elsewhere contemplates that, in limited circumstances, a court may consider conditions of life in the country of habitual residence. For example, Article 13 provides an exception to return where "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13, 19 I.L.M. at 1502.

3.

We now turn to the district court's application of the Convention to Son's circumstances. Father's overarching argument on appeal is that the district court erroneously concluded that the totality of the circumstances established that Son was "settled." Father suggests that the district court reached the wrong conclusion by: (1) overstating the stability of Son's living arrangements and schooling, (2) overstating Mother's financial security and the robustness of her support structure, and (3) ignoring the destabilizing effect of Son's immigration status. We disagree.

a.

With regard to Son's living arrangements and schooling, it is undisputed that he has lived in three different homes since arriving in the United States in 2013. Although each home was in the same geographic area in South Carolina, Son was required to enroll at a new school with each move. One consequence was that Son was absent from school a non-trivial number of days. Father suggests that such moves are inherently destabilizing and contends that Mother "presented no evidence establishing that [Son] could adjust to those new environments." Appellant's Br. 24.

20

In general, when all other things are equal, moving to a new home might reasonably be expected to destabilize a child's life for some period of time. But all other things are rarely equal. The record does not indicate that either of Mother's two moves after arriving in South Carolina was compelled by instability at the former residence. She was not, for example, evicted or forced from a condemned apartment. Rather, each move appears to represent part of a natural progression to an improved living situation. Upon arriving in South Carolina, Mother first lived with the children in her mother's house. J.A. 444. Within a few months she moved herself and the children into a bigger home. Id. She ultimately moved once more to share a home with Vasquez. Id. The district court found that the final move "was within the same community and school district in Darlington County," id., and that Vasquez and Mother "are involved in a stable, loving relationship and . . . eventually plan to marry." J.A. 432. On the whole, the record suggests that each move broadly represented an overall improvement in living conditions for the family.

Regardless, however, of the reasons behind each move, the question is whether Son is "now settled." Father is correct that even if Mother's reasons for moving are unimpeachable, if Son could not adjust to his environment because of them, he will not be settled. However, the record indicates that Son has

21

adjusted quite well. The district court found that Son had rapidly learned English such that he was earning As in his English classes without any accommodations and that Son had "consistently attended elementary school and done above-average, if not well." J.A. 445. Nothing in the record indicates these findings are clearly erroneous. Father argues that Son's academic performance is not suggestive of a stable home life or an ability to adjust to his environment, but we think otherwise. It is not impossible for a child with an unstable home life to do quite well in school, but it is certainly more difficult. It was reasonable for the district court to infer that Son's strong academic development suggests a baseline stability to his life. Additionally, Son's language acquisition and report cards are only part of the evidence of a successful adjustment to his environment. For example, the district court also found that Son had established friendships at school, church, and in his neighborhood, and that Son was "well-liked by his peers." J.A. 443. These findings are not clearly erroneous and are additional evidence of Son's successful adjustment. We thus reject Father's contention that Mother has not presented evidence of Son's ability to adjust to his new environment, or that the moves necessarily prevent Son from having stability and permanence in his life.

22

b.

We next turn to Father's contention that Mother and Son lack a financial or social support network, such that Son leads an insecure life in his new environment. This contention is not supported by the record. In fact, the record strongly suggests the opposite.

The district court's bottom line findings were that Mother "is clearly able to provide for the minor children," J.A. 444, that they "are provided with adequate clothing, food, and shelter," id., and "that the minor children are well-cared for, have access to medical care, and are supported by a network of family and friends." J.A. 445. The district court additionally found that Son has "a significant number of family members in the area . . . . [and has] extensive contact with those family members and attend[s] numerous family gatherings." J.A. 443. These findings are not clearly erroneous. Father repeatedly suggests that Mother's immigration status—which we discuss below—should have prevented her from developing a support system and providing for Son's needs. Whether or not that is a useful expectation a priori, the record makes plain that Mother has more than provided for Son's needs. As the district court found, "[the children,] by all accounts, are thriving. Since their arrival, both children have gained weight and are happy

23

and healthy.  [Son] is doing well in school and has many friends." J.A. 453.

c.

We now turn to Father's main argument concerning Son's immigration status.  Father argues that the lack of any lawful immigration status for Mother or Son (and to a lesser extent for Vasquez and various family members), is inherently destabilizing in a way that necessarily prevents Son from being settled. Father provides an extensive accounting of services and benefits that are legally unavailable to individuals lacking lawful status and describes various potential adverse legal consequences to Mother's and Son's continued unauthorized residence in the United States.  Father argues that the district court "ignore[d] the destabilizing effect" of Son's immigration status, Appellant's Br. 25, and that it misinterpreted the role immigration status plays in the "settled" analysis.

As an initial matter, the district court clearly did not ignore the fact that Mother and Son lack a lawful immigration status.  The district court's opinion includes a lengthy and thoughtful discussion grappling with the facts and consequences of their status.  In any event, as explained below, the district court's ultimate conclusion as to the role of immigration status in the analysis was correct.

24

Neither the Hague Convention nor ICARA makes a lack of immigration status a bar to finding that a child is settled. Indeed, it runs counter to the purpose of the exception to read such a categorical bar into the treaty. If a child is functionally settled, such that ordering his or her return would be harmfully disruptive, it would be odd to nevertheless order that disruption based on a formal categorization. Cf. Lozano, 697 F.3d at 56-57 ("[T]he Convention's overarching focus [is] on a child's practical well-being."). The three other circuits to have considered the issue have each concluded "that immigration status is neither dispositive nor subject to categorical rules," but should instead be considered in the totality of the child's circumstances. Hernandez, __ F.3d __, 2016 WL 1719955, at * 5; see also, Lozano, 697 F.3d at 57; In re B. Del C.S.B., 559 F.3d at 1010. We agree.

In considering the impact of Mother's and Son's immigration status on the totality of Son's circumstances, the district court properly focused on the manifested practical impact on the security, stability, and permanence of Son's life. As discussed earlier, the district court made numerous factual findings concerning Son's assimilation into his new environment and the overall stability of his academic, social, religious, and family life. After carefully reviewing the record, these underlying factual findings do not appear clearly erroneous to us and we

25

will not disturb them.  In considering the impact of immigration status, the district found that "there is nothing to suggest that, at this moment, or in the near future, the immigration status of the minor children is likely to upset the stability of their life in their new environment."  J.A. 445.  The district court further found that there was no indication that Son was "likely to suffer any harm from [his] inability to receive certain government benefits" due to his status.  Id.  As before, none of the record facts the district court points to in support of these conclusions is clearly erroneous.

Even if we assume that Son's immigration status made it more difficult for him to settle into his new environment, or makes him relatively less settled than he would otherwise be, neither assumption precludes Son from being settled as a practical matter.  As explained above, a court's proper task here is to consider Son's overall situation.  As in all lives, there may be destabilizing influences that are compensated for by other stabilizing ones.  The record facts as a whole establish that Son has developed significant connections to his new environment such that his life is stable, secure, and

permanent; if his immigration status is destabilizing, something else is apparently compensating.[9]

### d.

In sum, we do not think that the district court made any essential factual findings that were clearly erroneous. The district court applied those facts to the correct legal standard under the Convention. Reviewing the record facts as a whole, we agree with the district court that a preponderance of those facts establishes that Son has significant connections demonstrating a secure, stable, and permanent life in his new environment. Son is therefore "settled" within the meaning of the Convention.

### IV.

Father makes one additional argument on appeal that merits consideration. He argues that even if a child is "settled," courts nevertheless retain discretion to order the child returned and that the district court erred in failing to do so.

---

[9] Some of Father's arguments concerning the impact of Son's immigration status on his future well-being may have more salience in a custody determination. As we noted earlier, we do not undertake any determination about whether Son's interests are better served residing with his mother or his father. A court that ultimately makes such a determination will need to consider a variety of historical facts and circumstances that are not relevant to our decision here.

27

We agree that a "settled" determination does not preclude a court from ordering a child returned. We disagree, however, that the district court erred in declining to do so.

We have previously held that under the Hague Convention courts retain the discretion to order return even if one of the exceptions is proven. Miller, 240 F.3d at 402. This retained discretion flows from the fact that although Article 12 permits a court to decline to order the return of a settled child, it does not require the court to so decline. Consistent with this structure, Article 18 specifically provides that provisions of the Convention such as Article 12 "do not limit the power of a judicial or administrative authority to order the return of the child at any time." Convention, art. 18, 19 I.L.M. at 1503.

However, the Convention provides no explicit guidance as to when a court should exercise such discretion. In a concurring opinion in Lozano, Justice Alito suggested several considerations that might counsel in favor of ordering return notwithstanding an applicable Convention exception. 134 S. Ct. at 1237 (Alito, J., concurring). Father urges us to adopt these considerations as an operative legal standard, but we see no need to do so at this time.[10]

---

[10] The district court in fact considered Justice Alito's suggested factors as part of its analysis and concluded that they weighed against discretionary return.

It is sufficient for present purposes to note that the discretion to order return is grounded in principles of equity. See, e.g., Yaman v. Yaman, 730 F.3d 1, 4, 21 (1st Cir. 2013). Here, we are not persuaded that equitable considerations warrant ordering Son's return.[11] Father stresses the inequity of Mother's wrongful removal of the children and the need to deter such abductions. The Convention "of course . . . reflects a design to discourage child abduction." Lozano, 134 S. Ct. at 1235. "But the Convention does not pursue that goal at any cost." Id.

If we were to hold that wrongful removal in itself should lead courts to exercise their retained discretion in the face of an established Convention exception, we would render that exception a nullity: a necessary predicate to considering whether a child is "settled" is a determination that the child was wrongfully removed; if the latter were sufficient to warrant ordering return, the settled determination would be meaningless. Just as we were mindful that the Convention's "[exceptions] are to be interpreted in a restrictive fashion if the Convention is not to become a dead letter," Lozano, 697 F.3d at 56 (quoting

_____

[11] Father suggests there is debate as to whether such a "non-return" decision should be reviewed de novo or for abuse of discretion. Appellant's Br. 17-18 (citing Yaman, 730 F.3d at 4, and In re B. Del C.S.B., 559 F.3d at 1008-09). We need not decide the issue here, as we do not think the district court reversibly erred under either standard.

29

Perez-Vera Report ¶ 34), we are also mindful that the Convention's signatories did not intend the exceptions to be dead letters either.

As the district court noted, beyond the fact of the wrongful removal, "[t]here was no inequitable conduct such as concealment on [Mother's] part."  J.A. 453.  Father's arguments to the contrary are not persuasive.  We conclude that equitable principles do not weigh in favor of ordering Son's return.

V.

For the foregoing reasons, we affirm the district court's determination that Son is "settled" within the meaning of the Hague Convention and affirm its decision not to exercise its discretion to order Son returned.

AFFIRMED