**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1979**

XOCHITL JAZMIN VELASCO PADILLA,

Petitioner – Appellant,

v.

JOE RICHARD TROXELL,

Respondent – Appellee.

Appeal from the United States District Court for the Western District of Virginia, at Danville.  Jackson L. Kiser, Senior District Judge.  (4:16-cv-00024-JLK)

Argued:  January 24, 2017                          Decided:  March 8, 2017

Before MOTZ, DUNCAN, and HARRIS, Circuit Judges.

Affirmed by published opinion.  Judge Duncan wrote the opinion, in which Judge Motz and Judge Harris joined.

**ARGUED**: Kelly Ann Powers, MILES & STOCKBRIDGE P.C., Washington, D.C., for Appellant.  Christopher George Michel, KIRKLAND & ELLIS LLP, Washington, D.C., for Appellee.  **ON BRIEF**: Stephen J. Cullen, Leah M. Hauser, Rachel N. Mech, MILES & STOCKBRIDGE P.C., Washington, D.C., for Appellant.   Erin E. Murphy, KIRKLAND & ELLIS LLP, Washington, D.C., for Appellee.

DUNCAN, Circuit Judge:

Petitioner-Appellant Xochitl Jazmin Velasco Padilla ("Petitioner") appeals the district court's denial of her petition for the return of her now five-year-old child J.V. ("Child"), after Respondent-Appellee Joe Richard Troxell ("Respondent") took Child to the United States. Petitioner filed her petition under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501, as implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.* The district court denied the petition, finding that Petitioner had established that Child was wrongfully removed but that Respondent had adequately shown at least one defense under the Hague Convention --that is, that Petitioner had consented to Child's removal from Mexico. For the reasons that follow, we affirm.

I.

A.

1.

Petitioner gave birth to Child on May 27, 2011 in the state of Oaxaca, Mexico. Child's biological father is unconfirmed. However, the parties believe Respondent is the paternal grandfather. Respondent--a U.S. citizen residing in Mexico at the time--offered to provide support for Child. In January 2012, when Child was about eight months old, Petitioner and Respondent agreed that Respondent would serve as Child's legal father. Accordingly, Respondent registered himself as Child's father, and his name appears on

2

the birth certificate. As stipulated by the parties, Respondent is the legal father and has parental rights under Mexican law.[1]

For the first two years of Child's life, although Respondent had little to no physical contact with Child, he did provide financial support. On December 17, 2014, Petitioner and Respondent traveled to Oaxaca to obtain a Mexican passport for Child. After they obtained Child's passport together, Respondent took Child to his home in Acapulco until Child entered the United States.

The parties' descriptions of the circumstances under which Child entered the United States vary dramatically. Although the district court was to find Petitioner's version of events not credible, we nevertheless set out both versions for the sake of comprehensiveness.

2.

According to Respondent, Child spent his first two years not with Petitioner, but primarily in Petitioner's mother's care. In early 2014, Petitioner's mother called Respondent and stated that Child wanted to see Respondent. Respondent and his then-fiancée, now-wife Blanca Leyva ("Ms. Leyva") picked up Petitioner's mother and Child from the bus station, and they stayed at Respondent's home in Acapulco for several days. During the visit, Petitioner's mother said she wanted help bringing Child to the United States and that Child would require a passport and visa to enter the country. Respondent

---

[1] Mexican law permits an unwed mother to register a person other than the biological father as the legal father of a child. App. 76, 178; *see also* Mex. Civ. Code Ann., tit. 4, art. 60.

3

was planning to move to the United States, both to marry Ms. Leyva and to undergo surgery. He obtained a "fiancée visa" authorizing Ms. Leyva to enter the country to get married, and he told Petitioner's mother that he would also apply for a passport for Child. After this visit, Respondent began preparing for the move. When Respondent informed Petitioner's mother that Child's passport would require Petitioner's signature, she confessed, "I don't know where [Petitioner] is." App. 578. Eventually, a friend helped Petitioner's mother locate Petitioner in Zaachila, a town six hours north near the city of Oaxaca. In early December, Respondent and Ms. Leyva traveled to Rio Grande to pick up Child from Petitioner's mother, then to Zaachila to pick up Petitioner, and finally to the passport office in the city of Oaxaca.

On December 17, 2014, Petitioner, Respondent, and Child--as well as Petitioner's half-sister, Maria Luisa Banos Castillo ("Ms. Banos"), and her children--went to the passport office. Petitioner and Respondent jointly signed for Child's passport, which they received later that day. The entire group stayed the night at the house where Petitioner was living. The next day, December 18, the group celebrated Ms. Leyva's birthday. On the morning of December 19, Respondent and Ms. Leyva returned with Child to Respondent's home in Acapulco, where they resided until leaving for the United States.

Respondent testified that Petitioner never told him that she wanted him to bring Child into the United States illegally without her. However, according to Respondent, during the visit to obtain Child's passport, Petitioner "agreed to sign over custody" to Respondent, App. 583, because she believed he would be able to get Child on the "right

4

track," App. 584. Ms. Leyva later testified that Respondent and Petitioner specifically discussed taking Child to the United States so that Child could "have a better life." App. 635. Although Ms. Leyva stated "there was no plan," the prospect of moving to a U.S. city "was always on the table" between the parties. App. 634; *see also* App. 635.

3.

For her part, Petitioner contended that during Child's first two years she had only been separated from Child for six weeks. Petitioner stated that she went to get a passport for Child because Respondent offered to "get papers for me and my child," so that "perhaps I could have a vacation" in the United States with Child.[2] App. 536. According to Petitioner, Respondent took Child without her knowledge and consent. She stated that on the day of the visit to the passport office--December 17, 2014--Respondent and Ms. Leyva disappeared with Child.

4.

The parties' stories converge again on February 17, 2015, when Border Patrol agents found Child near McAllen, Texas, along with several other undocumented individuals who had crossed the border illegally. The agents contacted Respondent, who had entered the United States with Ms. Leyva. Respondent acknowledged he had paid

---

[2] Because Petitioner herself stated that she wanted a passport for Child, an apparent discrepancy between the district court's opinion and the record does not alter our analysis. With regard to Respondent's account of events, the district court appears to have confused Petitioner with Petitioner's mother. The district court stated that around January 2014 *Petitioner* contacted Respondent and stated that Child wanted to see him, and that *Petitioner* and Child stayed with Respondent and Ms. Leyva for several days at Respondent's home in Acapulco. App. 652–53. However, Respondent's testimony was that *Petitioner's mother* did so. App. 576–77.

5

$1,200 to smuggle Child into the United States. Respondent testified that, because Ms. Leyva's "fiancée visa" would expire before he could obtain Child's visa, he "had no other choice." App. 599. After determining that Respondent was Child's father, that Respondent did not have a criminal history, and that Child was not the subject of missing child alerts, the agents released Child to Respondent's custody.

Since living with Child in the United States, Respondent and Ms. Leyva maintained regular contact with Petitioner. As evidenced by text messages from September 2015 until January 2016, the tone of the initial correspondence was amicable and reflected Petitioner's recognition that Child was better off with Respondent in the United States as long as she was allowed to see him. As late as January 13, 2016, nearly a year after Child entered the United States, Respondent asked, "what [do] you think is best for the life of [Child] and where is best for him to live[?]" Petitioner responded, "I know with you." App. 477; *see also* App. 479.

Petitioner also repeatedly blamed her mother for any efforts to have child returned to Mexico and disavowed interest in doing so. For example, she told Ms. Leyva that if Respondent would help her she would "do everything to stop" the dispute. App. 383; *see also* 357, 385, 391.

Petitioner conditioned her support for Respondent, however, on Respondent's continued financial assistance. Petitioner repeatedly assured Respondent and his new wife that Petitioner was "not going to fight for" Child, App. 353, and that she would stop efforts seeking return of Child as long as Respondent provided money. She stated: "you forward 3,000 please and I will give the guardian and custody," App. 459, and "I will do

6

everything for [Child] to be with you but I really need the money," App. 475.  The text messages indicate Respondent provided such support.  *See* App. 459 (responding to Petitioner's request for "3,000" by sending more than $3,000 later that same day); *see also* App. 425 (sending over $1,500 to Petitioner).  Respondent testified that Petitioner and her family asked him for money "[m]ore [times] than [he could] count."  App. 592.

By February 2016, however, Petitioner's position had changed.  She now stated that "I don't care about the money."  App. 443.  She cared about "getting my son back."  App. 443.

B.

1.

On May 23, 2016, Petitioner filed the instant petition under the Hague Convention in federal district court, and a bench trial was held on July 25, 2016.[3]  The court accepted the parties' joint stipulation, heard testimony from Petitioner, Respondent, Petitioner's sister, and Ms. Leyva, and admitted a number of documentary exhibits.

During the trial, several inconsistencies in Petitioner's version of events became apparent.  Petitioner testified (1) that Child was her firstborn; (2) that she had only been separated from Child for six weeks; (3) that she had never asked Respondent for money; and (4) that in her communications with Respondent after his move to the United States she had only sought Child's return.  On cross-examination, however, Petitioner admitted

---

[3] On December 11, 2015, Petitioner filed a petition for return of Child under the Hague Convention in Virginia state court.  After the state court declined to adopt her proposed hearing schedule, on May 11, 2016, Petitioner submitted a voluntary nonsuit order dismissing the action.

(1) that she had previously given birth to another child; (2) that she had lived at least four or five months apart from Child;[4] and (3) that she had asked Respondent for money several times, including in (4) text messages she sent after Child's move to the United States that did not seek Child's return. As for the alleged abduction, Petitioner also testified that Respondent took Child while she was going to the bathroom, which conflicted with her prior account that Respondent disappeared with Child while she was buying ice cream. Although Petitioner's sister, Maria Candelaria Velasco Padilla, testified that Petitioner "was always with her baby" before the birth of her third child in 2013, App. 569, she said nothing to support Petitioner's narrative of the day of the alleged abduction in December 2014.

Respondent testified as to his version of events, and Ms. Leyva confirmed his account. Respondent also introduced a sworn affidavit from Ms. Banos, Petitioner's half-sister who was present during the visit to the passport office. In the affidavit, Ms. Banos stated that Respondent had not abducted Child. Respondent argued that the district court should admit the document as self-authenticating both because it was "lawfully executed by a notary public" under Federal Rule of Evidence 902(8) and because it "relate[d] to the application or petition" and was therefore "admissible" under Article 30 of the Hague Convention and the implementing provision of ICARA, 22 U.S.C. § 9005. Petitioner argued that the document was not self-authenticating because it did not contain

---

[4] Petitioner also conceded that she had obtained a federal identification card with an address in Zaachila six hours away from her hometown and the place where Child went to school, suggesting that she did not provide day-to-day care for Child.

certification from a foreign government official as required under Federal Rule of Evidence 902(3). More than once, counsel for Petitioner stated that the "basis" for the objection was Federal Rule of Evidence 902(3). App. 639; *see also* App. 641. The district court took the affidavit under advisement and promised an expedited written opinion on the petition.

2.

On July 28, 2016, the district court denied the petition. In its opinion, the district court found Petitioner had established, "by a preponderance of the evidence, that [Child] was wrongfully removed (or retained) from [Child's] habitual residence in violation of [Petitioner's] custody rights." App. 651. Nevertheless, the district court found that Respondent had "adequately shown" that Petitioner consented to Child's removal from Mexico, a defense under the Hague Convention. App. 651. The court further noted the "evidence established that Petitioner . . . had no objections to [Child] remaining in Respondent's care so long as Respondent supported her financially." App. 655.

In reaching these conclusions, the district court made an express credibility determination. The court stated that "Petitioner's testimony raised serious doubts about her credibility," and that the "ease with which she misl[e]d the court" on at least one issue--the number and birth order of her children--"calls into question all of her factual testimony." App. 655. Accordingly, the district court found that there was "only one credible version of events: Respondent's." App. 655.

As for the sworn statement of Ms. Banos, the district court admitted the affidavit into evidence as "self-authenticating under Federal Rule of Evidence 902(8)."

9

App. 653 n.7. The court referenced it once in a footnote, observing that it "supported" Respondent's "version of events." App. 653 n.7.

Petitioner timely appealed. This court considered the case under an expedited schedule in accordance with Article 11 of the Hague Convention. Hague Convention art. 11, 19 I.L.M. at 1502; *see also Chafin v. Chafin*, 133 S. Ct. 1017, 1021 (2013).

## II.

On appeal, Petitioner argues that the district court erred in (1) finding that she consented to or acquiesced in Child's removal to and retention in the United States; (2) admitting into evidence the sworn affidavit of Ms. Banos, thereby prejudicing her case; and (3) not ordering the return of Child under its discretionary authority pursuant to Article 18 of the Convention. Respondent counters that the district court correctly determined that Petitioner consented to the removal, and that additional grounds also support denial of the petition.

"We review the district court's findings of fact for clear error and review its construction and application of the Hague Convention de novo." *Alcala v. Hernandez*, 826 F.3d 161, 168 (4th Cir. 2016) (citing *Maxwell v. Maxwell*, 588 F.3d 245, 250 (4th Cir. 2009)). "Under the clearly erroneous standard, a district court's determination should be affirmed unless the Court is 'left with the definite and firm conviction that a mistake has been committed.'" *Andrews v. Am.'s Living Ctrs., LLC*, 827 F.3d 306, 312 (4th Cir. 2016) (quoting *Mallory v. Booth Refrig. Supply Co.*, 882 F.2d 908, 909 (4th Cir. 1989)). Where, as here, "a district court's factual findings turn on assessments of witness

10

credibility or the weighing of conflicting evidence during a bench trial, such findings are entitled to even greater deference." *FTC v. Ross*, 743 F.3d 886, 894 (4th Cir. 2014) (quoting *Helton v. AT&T, Inc.*, 709 F.3d 343, 351 (4th Cir. 2013)). We review the district court's evidentiary rulings under the Federal Rules of Evidence for abuse of discretion and its interpretations of such rules de novo. *In re C.R. Bard, Inc., MDL No. 2187, Pelvic Repair Sys. Prod. Liab. Litig.*, 810 F.3d 913, 923 (4th Cir. 2016).

III.

A.

1.

The Hague Convention sets forth a detailed framework for addressing claims of international child abduction during domestic disputes between parties in signatory nations.[5] *See Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1228 (2014). After the United States ratified the Convention, Congress implemented it through ICARA. *Alcala*, 826 F.3d at 169. As relevant here, the Convention provides that a child who was "wrongfully removed" from his place of habitual residence in violation of a person's custody rights must be returned to that place unless certain "narrow exceptions" apply. *Id.*

---

[5] The United States ratified the Convention in 1988, and Mexico did so in 1991. *See In re B. Del C.S.B.*, 559 F.3d 999, 1002 n.1 (9th Cir. 2009).

The district court concluded that Respondent had wrongfully removed Child from Mexico into the United States. The parties do not contest that determination on appeal. We therefore consider Petitioner's arguments about Respondent's applicable defenses.

2.

Once a petitioner has shown a wrongful removal occurred, the burden shifts to the respondent to establish that one of the exceptions in the Convention "excuses return" of the child. *Lozano*, 134 S. Ct. at 1229. These exceptions are limited and narrow. *Alcala*, 826 F.3d at 169. Among them, the Convention provides that a court "is not bound to order the return of the child," if the petitioning parent either "consented to" or "subsequently acquiesced in the removal or retention" of the child. Hague Convention art. 13a, 19 I.L.M. at 1502. Respondent bears the burden of establishing consent or acquiescence by a preponderance of the evidence. *See* 22 U.S.C. § 9003(e)(2)(B).

Neither the Hague Convention nor its implementing statute, ICARA, define consent or acquiescence. Although construing this defense presents an issue of first impression in this circuit, our sister circuits have experience distinguishing and applying the consent and acquiescence defenses.

Consent and acquiescence are two separate and "analytically distinct" affirmative defenses. *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005); *see also Darin v. Olivero-Huffman*, 746 F.3d 1, 14 (1st Cir. 2014). Whereas the consent defense concerns the petitioner's conduct before the contested removal or retention, the acquiescence defense concerns whether the petitioner subsequently agreed to or accepted the removal or retention. *Darin*, 746 F.3d at 14; *accord Baxter*, 423 F.3d at 371; *Gonzalez-Caballero v.*

12

*Mena*, 251 F.3d 789, 794 (9th Cir. 2001). Courts have explained that the acquiescence defense often requires more formality than consent; accordingly, to find acquiescence we look to evidence such as testimony in a judicial proceeding, a convincing renunciation of rights, or a consistent attitude over a significant period of time. *See Darin*, 746 F.3d at 16; *accord Baxter*, 423 F.3d at 371. By contrast, a petitioner's statements or conduct--formal or informal--can manifest consent. We evaluate what the petitioner contemplated and agreed to, as well as the nature and scope of consent, including any conditions or limitations. *Darin*, 746 F.3d at 15; *accord Baxter*, 423 F.3d at 371. For both the consent and acquiescence defenses, the inquiry turns on the petitioner's subjective intent. *See Baxter*, 423 F.3d at 371.

We affirm on the dispositive basis of the consent defense. We therefore decline to consider whether the record also supports a finding that Petitioner acquiesced in the removal or retention of Child.[6]

To establish consent, we focus on the parties' conduct *prior* to the removal or retention. *See Darin*, 746 F.3d at 15. However, a petitioner's conduct *after* removal can further inform whether she consented at the time of removal. *See Mena*, 251 F.3d at 794. Determining whether the preponderance of the evidence supports a petitioner's subjective intent to consent to removal is naturally "fact-intensive." James D. Garbolino, Federal Judicial Center, *The 1980 Hague Convention on the Civil Aspects of International Child*

---

[6] We also need not consider whether the consent and acquiescence defenses are "mutually exclusive." Appellant's Br. at 19. For the same reason, we also decline to reach the defenses on which Respondent argues we can alternatively affirm.

13

*Abduction: A Guide for Judges* 102 (2d ed. 2015). Accordingly, this inquiry depends to a considerable extent on the district court's factual and credibility determinations. *See Nicolson v. Pappalardo*, 605 F.3d 100, 105–06 (1st Cir. 2010). In these types of disputes, the district court often "face[s] . . . a choice as to whom it [finds] more believable." *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996); *cf. Smedley v. Smedley*, 772 F.3d 184, 190–91 (4th Cir. 2014) (not elaborating on the consent defense, but finding that district court properly extended comity to German court's judgment, including its decision not to credit father's version of events).

3.

Petitioner's conflicting testimony about basic personal information led the district court to question "all of her factual testimony." App. 655. The district court ultimately concluded Respondent's version of events was the only credible one. We owe this express credibility determination substantial deference, and Petitioner, tellingly, does not challenge it on appeal. *See Friedrich*, 78 F.3d at 1069; *see also Andrews*, 827 F.3d at 312; *Ross*, 743 F.3d at 894.

Bolstered by the credibility determination, we agree with the district court's legal conclusion that a preponderance of the evidence demonstrates Petitioner consented to Child's removal to the United States.[7] The district court found that Petitioner willingly

---

[7] Petitioner argues that the district court improperly shifted the burden of disproving consent to her. We disagree. The district court began by placing the burden of showing wrongful removal on Petitioner, as ICARA requires. *See* App. 651 ("Petitioner must show, by a preponderance of the evidence, that [Child] was wrongfully removed."); 22 U.S.C. § 9003(e)(1)(A). After finding that Petitioner had "made this
(Continued)

14

accompanied Respondent to obtain Child's passport and agreed to surrender custody to Respondent so that Child could have a better life. Ms. Leyva's testimony and the sworn affidavit of Petitioner's half-sister, Ms. Banos, corroborate Respondent's story. The text messages--exchanged between September 2015 (a little more than six months after Child's removal) and January 2016--reinforce the conclusion that Petitioner consented to removal of Child to the United States. To be sure, Respondent acknowledged that Petitioner never told him she wanted him to bring Child into the United States illegally, and how a Child is removed is one factor to consider in assessing the scope of consent.[8] Still, Petitioner repeatedly said that Child was better off with Respondent in the United States, thus suggesting that she did not view Respondent as an abductor. In the context of Respondent's impending move to the United States, the combination of Petitioner's conduct in signing for Child's passport and her statements during the passport visit to

showing," the district court then shifted the burden to Respondent, again as ICARA requires, holding that "*Respondent has established* . . . that Petitioner consented to [Child] being brought into this country." App. 651 (emphasis added); 22 U.S.C. § 9003(e)(2)(B). Later, the district court emphasized again that "because *Respondent has adequately shown* that Petitioner consented to [Child's] removal from Mexico, I will not order [Child] returned to his home country." App. 651–52 (emphasis added) (footnote omitted). Petitioner's brief cites one sentence that she says indicates improper burden shifting: the district court's finding that Petitioner "has offered no explanation why she would have consented to acquiring a passport for her [Child] unless there were plans for [Child] to travel to the United States." Appellant's Br. at 16–17 (quoting App. 654). But that sentence is simply part of the district court's explanation for why "Respondent has adequately shown that Petitioner consented" to Child's removal. App. 651–52.

[8] *Cf. Alcala*, 826 F.3d at 165, 173–74 (noting that mother brought her child into the United States without legal authorization but concluding that mother could still establish a defense to wrongful removal under the Hague Convention).

Respondent that Child would be better off with him--as well as her subsequent text messages expressing same--all support the conclusion that she consented to Child's relocation.[9] *See Mena*, 251 F.3d at 793–95.

B.

Next, Petitioner argues that the district court improperly admitted the affidavit from her half-sister, Ms. Banos, because (1) it was inadmissible hearsay not subject to any exception and (2) the document unduly prejudiced her case. Respondent counters that Petitioner failed to raise the issue below and therefore may not do so here. We agree.

At trial, Petitioner failed to raise a hearsay objection to the affidavit. Although Petitioner objected to the affidavit, she only objected to the *authentication* of the document, not to its *inadmissibility* as hearsay. More than once, counsel for Petitioner explicitly stated that the "basis" for the objection was Federal Rule of Evidence 902(3), not Rules 803 and 804, which govern hearsay. App. 639; *see also* App. 641 (same). An evidentiary objection on one basis is insufficient to preserve an evidentiary objection on a different basis. *See United States v. Cabrera-Beltran*, 660 F.3d 742, 751 (4th Cir. 2011).

---

[9] To be sure, some evidence could be read to support Petitioner's version of events. For instance, in her text message from February 2016 Petitioner stated, "I don't care about the money," and instead "what I care about is getting my son back." App. 443. This message could be interpreted as a mother protesting her child's removal or trying to placate her child's abductor. But when read in the context of Petitioner and Respondent's ongoing dialogue months after Child's removal to the United States, the message could also be viewed as Petitioner merely "regretting her decision," *Baxter*, 423 F.3d at 372, or post-litigation posturing. In any event, it does not detract from the numerous other text messages in which Petitioner sought money--evidence that supports the inference she was using litigation as a bargaining chip--and agreed Child was better off in the United States with Respondent. The district court did not err in concluding that a preponderance of the evidence indicates Petitioner consented to Child's removal.

16

Petitioner failed to make a hearsay objection below and therefore failed to preserve the issue for appeal.[10] *See* Fed. R. Evid. 103(a) (requiring a "timely" and "specific" objection "on the record" to preserve evidentiary admissibility for appellate review); *United States v. Parodi*, 703 F.2d 768, 783 (4th Cir. 1983) (untimely or unspecific evidentiary objection is forfeited on appeal). At trial, Petitioner also did not object on the basis of Rule 403, and she does not explain on appeal how the district court's minimal reliance on the affidavit in one footnote prejudiced her case. Petitioner has also forfeited this argument on appeal.[11]

## C.

Finally, Petitioner argues, also for the first time on appeal, that the district court erred in not exercising its discretion under Article 18 of the Convention to order the return of Child even though Respondent had established at least one valid defense.

---

[10] To the extent Petitioner argues that the trial judge "prevented and impeded" her counsel from objecting on the basis of hearsay, Reply Br. at 3, that is not the case. Counsel for both parties engaged in an extended discussion with the trial judge about the affidavit, and counsel for Petitioner had ample opportunity to object on the basis of hearsay but failed to do so. Moreover, the record indicates counsel for Petitioner objected to other evidence on hearsay grounds.

[11] In any event, the district court's admission of, and minimal reliance on, the affidavit was at most harmless error due to the otherwise strong factual support for Respondent's version of events. *See* Fed. R. Evid. 103(a) (evidentiary error must affect substantial rights); *In re C.R. Bard, Inc.*, 810 F.3d at 923 (improperly admitting hearsay evidence was harmless error where result of proceeding would not have changed).

Petitioner did not raise this argument below, and we similarly consider it forfeited on appeal.[12]

IV.

We recognize the unfortunate nature of this case for all involved, especially Child. However, the Hague Convention and ICARA do not empower us to address "the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4); *Smedley*, 772 F.3d at 186. The district court did not clearly err in finding that Respondent was "more believable," *Friedrich*, 78 F.3d at 1069, and Petitioner does not challenge that determination. We agree with the district court that the preponderance of the evidence demonstrates that Petitioner consented to Respondent's removal of Child to the United States. Accordingly, the judgment of the district court is

AFFIRMED.

---

[12] We therefore decline to decide what standard of review applies to a district court's decision whether to exercise discretion under Article 18. *See Alcala*, 826 F.3d at 175 n.11.