**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 14-1414**

_____

DANIELA SMEDLEY,

                    Petitioner - Appellee,

          v.

MARK A. SMEDLEY,

                    Respondent - Appellant.

_____

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington.  James C. Fox, Senior District Judge.  (7:14-cv-00066-F)

_____

Argued:  September 17, 2014          Decided:  November 5, 2014

_____

Before NIEMEYER, DUNCAN, and THACKER, Circuit Judges.

_____

Affirmed by published opinion.  Judge Duncan wrote the opinion, in which Judge Niemeyer and Judge Thacker joined.

_____

**ARGUED:** Clifton Jason Humphrey, GAYLOR, EDWARDS, VATCHER & HUMPHREY, LLP, Jacksonville, North Carolina, for Appellant. Thurston Holderness Webb, KILPATRICK TOWNSEND & STOCKTON LLP, Winston-Salem, North Carolina, for Appellee.  **ON BRIEF:** Chad D. Hansen, Andrew W. Rinehart, KILPATRICK TOWNSEND & STOCKTON LLP, Winston-Salem, North Carolina, for Appellee.

_____

DUNCAN, Circuit Judge:

Ever since A.H.S. and G.A.S., the Smedley children, left North Carolina with their mother, Daniela Smedley, they have lived with only one of their parents. First, Daniela took them to Germany, where they stayed with her. Later, during a one-month visit to North Carolina to see their father, Daniela's ex-husband Mark Smedley, Mark decided to keep them. In each instance, the parent not housing the children (i.e. first Mark and then Daniela) petitioned under the Hague Convention on the Civil Aspects of International Child Abduction, a treaty designed to return children wrongfully removed from their "habitual residence."

A German court denied Mark's Hague petition, and a German appellate court affirmed, so Daniela did not have to return the children to North Carolina. After Mark decided to keep them following their visit, the U.S. District Court for the Eastern District of North Carolina accorded comity[1] to the German appellate court's decision. It therefore granted Daniela's Hague petition, ordering the children's return to Germany. On

---

[1] "A practice among political entities (as countries, states, or courts of different jurisdictions), involving esp. mutual recognition of legislative, executive, and judicial acts." Black's Law Dictionary 324 (10th ed. 2014).

appeal, Mark argues that the district court erred in according comity. For the reasons that follow, we affirm.

I.

The goals of the Hague Convention are "to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and . . . to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."[2] Convention on the Civil Aspects of International Child Abduction art. 1, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 98 ("Hague Convention") (implemented through the enactment of the International Child Abduction Remedies Act, 22 U.S.C. § 9001 et seq.). The Convention often comes into play when one parent abducts a child from the child's habitual residence to that parent's home country in order to gain a favorable custody ruling. Though the Convention does not empower courts to address "the merits of any underlying child custody claims," 22 U.S.C. § 9001(b)(4), its primary operative provisions, found in

---

[2] Both the United States and Germany are Contracting States. U.S. Dep't of State, Bureau of Consular Affairs, U.S. Hague Convention Treaty Partners, http://travel.state.gov/content/childabduction/english/country/hague-party-countries.html (saved as ECF opinion attachment) (last visited Nov. 4, 2014).

Articles 3, 12, and 13, do allow them to consider abduction challenges.

Under Article 3, the removal or retention of a child is wrongful when it breaches a person's rights of custody "under the law of the State in which the child was habitually resident." Hague Convention art. 3. The Hague Convention does not define "habitual residence." United States federal courts analyze a child's habitual residence on a case-by-case basis, taking into account first, whether the parents share an intent to make a particular country the child's home, and second, whether enough time has passed for the child to acclimatize to the residence. See Maxwell v. Maxwell, 588 F.3d 245, 251 (4th Cir. 2009). The underlying principle here is that "a parent cannot create a new habitual residence by wrongfully removing and sequestering a child." Miller v. Miller, 240 F.3d 392, 400 (4th Cir. 2001) (citing Diorinou v. Mezitis, 237 F.3d 133, 141–42 (2d Cir. 2001)).

If a removal or retention is found wrongful, Article 12 provides that the child must be returned unless certain defenses apply. See Hague Convention arts. 12, 13. If a defense applies, return is discretionary. Id. art. 13. The defenses include the following: (1) the person who had care of the child "was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently

4

acquiesced in the removal or retention"; (2) there is a "grave risk" that "return would expose the child to physical or psychological harm"; and (3) "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Id. Against that background, we now turn to the facts before us.

## II.

### A.

The Smedleys married in 2000 in Germany, where Mark was stationed as a member of the United States Army. Their children, A.H.S. and G.A.S., were born in 2000 and 2005, respectively. Except for approximately one year spent in Tennessee, the family lived in Bamberg, Germany, until August 2010, when Mark was transferred to North Carolina. He bought a house in Swansboro and brought the family with him.

At this point, the parties' stories diverge. Daniela claims that marital tensions, which had surfaced in Germany, were exacerbated in Swansboro by her homesickness and isolation to such an extent as to lead to discussion of divorce. Daniela maintains that she told Mark she was returning to Germany with the children permanently in May 2011, and he consented. Daniela and the children left on July 13th of that year. Because Daniela had agreed to take four weeks to reconsider her

5

decision, Mark bought them round-trip tickets with a return date of August 11, 2011. Mark told Daniela that if she chose to stay in Germany, he would try to relocate there to be close to the children. In late July 2011, Daniela informed Mark via phone of her decision to remain in Germany.

Mark, on the other hand, denies that he and Daniela ever discussed divorce and claims that the trip to Germany was to be nothing more than a one-month vacation. In his version, Daniela's decision to stay in Germany came as a complete surprise: he learned of it only after the late July phone conversation, about two weeks after she had already left North Carolina. She had not told him of her intent in May, and he had not consented to a permanent move.

B.

On September 2, 2011, Mark obtained a temporary custody order from the District Court of Onslow County, where Swansboro is located. In October, he filed a Hague petition in Germany seeking the children's return.

The District Court of Bamberg denied Mark's Hague petition. It based the denial in part on the findings of a court-appointed family advocate. The court credited the advocate's allegations that Mark had physically abused A.H.S. and found that returning the children to North Carolina would expose them to a serious risk of harm, one of the Article 13 defenses.

6

Mark appealed the District Court of Bamberg's decision to the Bamberg Higher Regional Court. There, Daniela, A.H.S., the family advocate, and a representative from the Office of Children Protection Services of Bamberg testified in person. Mark, who was unable to attend because his passport was expired, testified through his lawyer. The court agreed with Daniela that Mark had consented to the move to Germany, finding her testimony more credible than Mark's. As consent is another of the Article 13 defenses, the court held that Daniela need not return the children without determining whether North Carolina or Germany was their habitual residence.

C.

Mark and Daniela obtained a divorce under German law in May 2012, and the children lived with Daniela in Bamberg until August 2013. Daniela agreed in June 2013 to let the children visit Mark because they wanted a vacation and had not seen their father in two years. On August 6th, Mark picked the children up at Ramstein Air Base in Germany. He gave Daniela a notarized document stating that he would return the children on or about August 26, 2013, with the exact date to depend on the availability of military flights.

Expressing concerns over their dental care and schooling, Mark kept the children in North Carolina and informed Daniela of

7

his decision via Facebook on August 27, 2013. He enrolled the children in the Onslow County school system.

Daniela filed a Hague petition in the U.S. District Court on April 7, 2014. In a comprehensive opinion, the district court, ruling that the Bamberg Higher Regional Court's finding on consent was not "wholly unsupported," accorded comity to that decision.[3] J.A. 59.

First, the district court concluded that the German court's failure to determine the children's habitual residence was not fundamentally unreasonable because the decision "rested on what is akin to an affirmative defense in Article 13(a)": Mark's consent to the move. J.A. 56. Second, the district court reasoned that, based on the German court's credibility determinations, the testimony supported the contention "that Mark had agreed to the trip with the knowledge that Daniela and the children might not return. That the German court did not credit Mark's version of the story does not render its Article 13(a) determination . . . fundamentally unreasonable." J.A. 57. Third, the district court rejected Mark's argument that, because he did not formally manifest his non-consent, he did not consent to Daniela's decision, by noting that "[c]onsent . . . 'may be

---

[3] Henceforth in this opinion, the term "German court" refers to the Bamberg Higher Regional Court.

8

evinced by the [parent's] statements or conduct, which can be rather informal.'"  J.A. 58 (second alteration in original) (quoting Nicolson v. Pappalardo, 605 F.3d 100, 105 (1st Cir. 2010)).

Having found that Daniela did not wrongfully remove the children to Germany and reasoning that they had acclimatized to life in Germany between July 2011 and August 2013, the district court found that Germany was the children's habitual residence at the time of their visit to North Carolina.[4]  Because Mark did not assert any defense, the court allowed Daniela's petition and awarded her physical custody for the purpose of returning the children to Germany.[5]  This appeal followed.


                                III.

Our task is to decide whether the district court properly accorded comity to the German court's ruling that Daniela did not unlawfully remove the children to Germany.  This court has noted that, though foreign judgments are not entitled to full

---

[4] Mark does not contest that the children had acclimatized to life in Germany.  Rather, he argues that Germany was not the children's habitual residence at the time of their visit to North Carolina because Daniela's removal of them to Germany in 2011 was wrongful.

[5] We denied Mark's motion to stay the district court's order pending appeal.  Order, May 1, 2014, ECF No. 8.  Daniela returned to Germany with the children the next day.

9

faith and credit, "comity is at the heart of the Hague Convention." Miller, 240 F.3d at 400 (quoting Diorinou, 237 F.3d at 142) (internal quotation marks omitted). Accordingly, "American courts will normally accord considerable deference to foreign adjudications as a matter of comity." Id. (quoting Diorinou, 237 F.3d at 142) (internal quotation marks omitted). The Ninth Circuit has provided a useful framework for extending comity in Hague cases: "[W]e may properly decline to extend comity to the [foreign] court's determination if it clearly misinterprets the Hague Convention, contravenes the Convention's fundamental premises or objectives, or fails to meet a minimum standard of reasonableness."[6] Asvesta v. Petroutsas, 580 F.3d 1000, 1014 (9th Cir. 2009).

We have yet to decide whether to review comity decisions de novo or for abuse of discretion, and need not do so here.[7] Under

---

[6] Relying on Miller, Daniela urges this court to refrain from an in-depth review of the German court's opinion and simply ask whether its reliance on the Hague Convention was "reasonable." Appellee's Br. at 21. But Miller did not explicitly suggest that course, and the Second Circuit pointed out in Diorinou that "[a]lthough deference as a matter of comity often entails consideration of the fairness of a foreign adjudicating system, a case-specific inquiry is sometimes appropriate." Diorinou, 237 F.3d at 143 (citations omitted). In any event, whether we follow Daniela's proposed standard of review or that described in Asvesta, the result is the same because, as discussed below, the facts of this case render the German court's decision at least minimally reasonable.

[7] The Second Circuit held that the proper standard in cases (continued)

either standard, the district court properly extended comity because the German court's decision neither clearly misinterpreted the Hague Convention nor failed to meet a minimum standard of reasonableness.[8]  Mark makes two arguments on appeal, which we address in turn.

A.

Mark first argues that the German court clearly misinterpreted the Hague Convention because it failed to make a habitual-residence determination before addressing the defense of consent.  The order of analysis matters, he contends, because the German court "would have been compelled to find that [the children's] habitual residence was North Carolina," Appellant's Br. at 15, and such a finding "might have made a court respectful of the Hague Convention more reluctant to find that the defenses of Article 13 applied in the case," id. at 16.  We are not persuaded.

---

such as this one is de novo.  See Diorinou, 237 F.3d at 139–40. The Ninth Circuit acknowledged that holding but ultimately left the issue open.  See Asvesta, 580 F.3d at 1009–10.

[8] Mark argued to the U.S. District Court that the German court's failure to determine habitual residence clearly misinterpreted the Hague Convention and that by allowing Daniela "to forum shop for a jurisdiction that she preferred for custody," J.A. T.95, it contravened the Convention's fundamental premises.  Because both prongs turn on whether the German court's failure to determine habitual residence was proper, they are inextricably tied in this case.

11

Mark's contention that the German court would necessarily have found North Carolina to be the children's habitual residence is pure conjecture. Further, he cites no authority for the proposition that a court must decide habitual residence before addressing defenses. Nor is there anything in the text of the Hague Convention that requires a court to address Article 3 first. The Hague Convention does not set out a roadmap, only principles.

It is true that in Asvesta, the Ninth Circuit criticized a Greek court for failing to make a habitual-residence determination. 580 F.3d at 1017. The Greek court had decided that the respondent's retention of the child in Greece was not wrongful because the petitioner was not exercising his custodial rights at the time. See id. at 1016–17. But in Asvesta it was necessary to determine the child's habitual residence because that country determines custodial rights, see Hague Convention art. 3; as such, the Greek court could not have addressed custodial rights without first knowing the child's habitual residence, see Asvesta, 580 F.3d at 1017. The Ninth Circuit therefore reasoned that the Greek court's failure to determine the child's habitual residence cast doubt on its wrongful-removal determination under Article 3. Id.

By contrast, here the habitual-residence question was not dispositive or even helpful, as the court's conclusion did not

12

turn on habitual residence or custodial rights. Even if the German court had assumed that the children were habitual residents of North Carolina when Daniela took them to Germany, the finding that Mark consented to that move would have still provided her with an affirmative defense to wrongful removal.[9] The district court analogized such a process to granting summary judgment based on an affirmative defense after assuming that the plaintiff made out a prima facie case, as courts routinely do.

B.

We next consider Mark's argument that the German court's decision did not meet a minimum standard of reasonableness because the court unreasonably relied on contradictory evidence in making its credibility determination. The German court found credible Daniela's testimony that Mark knew she went to Germany with the intent of staying there with the children, and that Mark consented to that move in the event she did not change her mind. Though the court made such a determination with Mark present only through his lawyer, the decision was at least minimally reasonable.

According to the German court, Daniela's testimony was "detailed, coherent and consistent." J.A. 27. Also, A.H.S.

---

[9] Notably, the Asvesta court neither discussed nor even mentioned habitual residence when addressing the consent defense. See 580 F.3d at 1019–20.

13

corroborated it, stating that Mark had promised her she could stay in Germany. (The family advocate reported to the German district court that she found A.H.S. to be "very authentic," J.A. 66E, and confirmed that report to the regional court.)

By contrast, the German court found that Mark's testimony through his lawyer was not credible. In addition to being "unsubstantiated," J.A. 28, its accuracy was also called into question. Mark initially asserted to the German court that he first learned of Daniela's decision to stay in Germany on August 10, 2011, the day before the scheduled return flight. But he later admitted that nine days earlier, on August 1st, he had authored a Facebook post, which he had since removed, that read in part, "Please come back to me. I am really taking this hard right now." J.A. 37. That post casts doubt on Mark's initial statement about when he first learned of Daniela's decision,[10] and is also consistent with Daniela's story that she made her decision to stay in Germany prior to leaving North Carolina, while agreeing to reconsider.

---

[10] After Daniela introduced the Facebook post, Mark's lawyer telephoned him. Mark explained that Daniela told him over the phone in late July that she would probably not return. He would later attest the same to the U.S. District Court, and to this court in his brief. Even though the Facebook post is consistent with that testimony, the post is inconsistent with his initial testimony before the German court and thus supports that court's negative credibility determination.

14

Mark argues that this case is "virtually indistinguishable" from Asvesta, in which the Ninth Circuit found that the Greek court's consent determination was unreasonable.  Appellant's Br. at 19.  In Asvesta, the Greek court had found that the petitioner consented to the child's removal based on an ambiguous email and a notarized writing giving permission to his wife to travel temporarily with the child.  580 F.3d at 1019. In the email, dated November 2, 2005, the petitioner pleaded with his wife to stay in the United States.  Id. at 1005.  He wrote that if she would not, then he would ask for a divorce and she should "[g]o to Greece with the child and we will see how I will come to Greece to visit him."  Id.  He subsequently executed a writing, notarized on November 11, 2005, id. at 1019, which stated, "I hereby consent to Despina Asvesta Petroutsas to travel with our son . . . between the following dates[:] November 8, 2005-December 8, 2005," id. at 1005 (alteration in original).

The Ninth Circuit held that the Greek court's consent determination was "completely unsupported, and [was] indeed contradicted by, this evidence."  Id. at 1019.  First, the email could be read as consent to go permanently to Greece or to travel only temporarily, and in the context of the whole email, the latter was more likely.  Id.  Second, the notarized writing,

15

executed after the email was sent, unambiguously gave consent for only temporary travel.  Id.

By contrast, here there was no such evidence that rendered the German court's consent determination unreasonable.[11]  Whereas the petitioner's email in Asvesta could be read as giving consent for permanent or temporary travel, according to Daniela's testimony, which the German court credited, Mark unambiguously consented to a permanent move.  And unlike the petitioner in Asvesta, who submitted a writing clearly delineating the period of consent, Mark did not submit

---

[11] Evidence in the record supporting Mark's claims includes that he purchased round-trip tickets for Daniela and the children, that Daniela packed enough for only a short vacation--leaving valuables in North Carolina--and that Mark, within three months after the children left North Carolina, began proceedings to effect their return.  But that evidence does not render the German court's decision unreasonable.  Daniela testified to the German court that Mark bought round-trip tickets because they were cheaper than one-way tickets.  (We also note that the purchase of those tickets is consistent with her testimony that she promised to reconsider her decision to stay in Germany.)  And although on direct examination before the U.S. District Court, Mark discussed the items Daniela packed, Daniela testified in the German court--and it is the German court's decision we review for a minimum standard of reasonableness--that she brought the children's birth certificates in case she needed them for school enrollment or other purposes, and that Mark did not object.  Finally, even though Mark instituted custody proceedings and filed a Hague petition after Daniela reconfirmed her decision to keep the children in Germany, those actions are consistent with the notion that he simply regretted his earlier consent.

16

comparable evidence to the German court suggesting that Daniela's trip to Germany with the children was only a vacation.

Because Daniela's testimony was detailed and corroborated, and the evidence did not show that Mark's consent was for only temporary travel, the German court's decision was at least minimally reasonable.

IV.

Accordingly, for the foregoing reasons, the judgment of district court is

AFFIRMED.