Jose Gustavo Monterrosa SALGUERO,
Petitioner,

v.

Madonna Alexandra Marce Franco
ARGUETA,[1] Respondent.

No. 5:17–CV–000125–FL

United States District Court,
E.D. North Carolina,
Western Division.

Signed 06/16/2017

1. Respondent is now known as Madonna Alexandra Franco de Salinas.

Reed J. Hollander, Nelson Mullins Riley
& Scarborough LLP, Raleigh, NC, Ashley

V. Tomlinson, Laura Dale Associates, Houston, TX, Matthew A. Abee, Nelson Mullins Riley & Scarborough, LLC, Columbia, SC, for Petitioner.

Terry Rose, Terry F. Rose, Attorney at Law, Smithfield, NC, for Respondent.

## ORDER

## (UNDER SEAL) [2]

**LOUISE W. FLANAGAN, United States District Judge**

This matter is before the court on petitioner's first amended verified petition, seeking return of his minor child, S.M.M.F. ("the child") under the Hague Convention of the Civil Aspects of International Child Abduction ("Hague Convention") and the International Child Remedies Act, 22 U.S.C. § 9001 et seq. ("ICARA"). (DE 17). Expedited hearing was convened April 17, 2017, followed by additional briefing. The issues raised are ripe for ruling. For reasons that follow, the court grants the petition.

## BACKGROUND

Petitioner initiated action on September 9, 2016, in the Southern District of Texas, by filing a verified petition seeking return of his child pursuant to the Hague Convention and ICARA. The same date, petitioner filed a motion to expedite show cause hearing on the petition.

On October 4, 2016, that court issued an order setting a show cause hearing for October 11, 2016. The order required respondent to appear at hearing and to surrender all passports issued in her name and the child's name. The order also prohibited either party from removing the child from the Southern District of Texas until that time in which the court could address the matter.

Petitioner was not successful in his attempt to serve process at a Houston, Texas, address learned through the United States Department of State ("DOS"). Petitioner sought further assistance from the DOS. On December 28, 2016, petitioner filed a motion to extend service time through March 31, 2017, which the court granted by order dated January 19, 2017. On or around January 24, 2017, petitioner learned that respondent and the child were located in Raleigh, North Carolina. Petitioner then moved to transfer the case to this court, pursuant to 28 U.S.C. § 1404(a). The court granted petitioner's motion and transferred the case to this court on March 14, 2017.

Following transfer to this court, petitioner filed a first amended verified petition, together with an expedited ex parte motion for temporary restraining order ("TRO"). The court granted petitioner's motion and issued TRO on March 21, 2017, with hearing set for March 28, 2017. On motion by respondent, the court continued hearing until April 17, 2017, and extended the TRO with consent until resolution of the petition on the merits.

Prior to hearing, petitioner filed a series of expedited motions, which the court granted.[3] Respondent filed an expedited

---

2. The court's analysis relies, in part, on documents filed under seal. Within 14 days, the parties jointly shall return to the court by U.S. Mail, addressed to the case manager, a copy of this order marked to reflect any perceived necessary redactions. Upon the court's inspection and approval, a redacted copy of this

sealed order will be made a part of the public record.

3. Specifically, petitioner filed an expedited motion for foreign witnesses to testify remotely (DE 30) and an expedited motion for leave to serve subpoenas for the production of documents on a non-party (DE 32). Petitioner also filed an expedited motion, which sought

motion for remote testimony, which the court also granted. The parties filed joint stipulations on April 14, 2017.[4] Hearing commenced on April 17, 2017.

Two issues before the court may be summarized as follows: 1) whether petitioner has parental rights under Salvadoran law;[5] and 2) whether returning the child to El Salvador would place the child in grave risk of harm. On the first issue, the court heard expert testimony from Karla Menendez. Upon conclusion of Menendez's testimony, the court granted petitioner's motion to make a determination of foreign law. As memorialized herein, the court then found petitioner to have parental rights under Salvadoran law.

On the second issue, the court heard testimony from Lisandro Salinas ("Salinas"), William Vasquez, Benjamin Lucas Parrish, Jessica Flores de Martinez, and Marco Alberto Monterrosa Marroquin. The court also heard from petitioner and respondent. Upon conclusion of the witnesses' testimony, the court took the petition under advisement. In accordance with a directive from the court, the parties filed separate briefs on May 8, 2017. (DE 64; DE 65). Each party filed a reply brief on May 15, 2017. (DE 71; DE 74).

## STATEMENT OF FACTS [6]

The child was born in San Salvador, El Salvador, in 2011. Respondent is the child's mother and petitioner is her father. At the time of the child's birth, respondent and petitioner were married. After the child was born, the parties lived as a family in El Salvador with respondent's mother. In or about November of 2011, the parties and the child moved in with petitioner's mother. The parties lived with petitioner's mother until approximately March of 2012.

Sometime in August of 2012, the parties informally separated. During their separation, the child lived with respondent. In 2014, the parties legally separated. Following the requisite period of legal separation, the parties divorced in February of 2015. By divorce decree dated February 17, 2015, the court granted respondent personal care, or physical custody, of the child. (Tr. Day 1, DE 60, 33:17–18). The decree also gives petitioner certain visitation rights. The decree stipulates that the child is to live with respondent, but it does not give respondent authority to change the child's residence without petitioner's consent. (Id. 34:13–16). On June 18, 2015, the Salvadoran Family Court entered an order granting petitioner open visitation of the child. The order requires petitioner to pay child support.

On August 18, 2015, the Special Court for Children and Adolescents of San Salvador issued an order, which permitted respondent to take the child to the United States to visit Disney World.[7] The order

leave to serve subpoenas for the production of documents on the U.S. Department of Sate, U.S. Immigration and Customs Enforcement ("ICE") and the law firm Velasquez & Associates, PLLC. (DE 42)

4. The stipulations narrowed issues for hearing. Significantly, the joint stipulations provided that the child's habitual residence is El Salvador and petitioner filed the petition within the requisite time frame. The stipulations also provided that petitioner was exercising the rights granted to him by the Salvadoran Court, as recorded in a divorce decree

dated February 17, 2015, and court order dated June 18, 2015. (See DE 49).

5. To aid resolution of the first issue, petitioner filed a motion for a determination of foreign law. (DE 51).

6. Additional facts as relevant to the court's analysis of respondent's affirmative defense are discussed further herein.

7. In August of 2015, respondent attempted to obtain petitioner's consent to travel to the United States with the child. Because peti-

required the child to return to El Salvador by October 3, 2015. The order indicates that if the child did not return to El Salvador by the required date, then petitioner could seek recourse through the Hague Convention. (Tr. Day 1, DE 60 36:20–22). The Salvadoran court issued the child a passport on August 27, 2015. On November 2, 2015, defendant traveled with the child from El Salvador to Houston, Texas.[8]

## DISCUSSION

### A. The Hague Convention

The Hague Convention aims to "secure the prompt return of children wrongfully removed to or retained in any [c]ontracting state; and ... to ensure that rights of custody and access under the law of one [c]ontracting state are effectively respected in the other [c]ontracting [s]tate." Smedley v. Smedley, 772 F.3d 184, 186 (4th Cir. 2014) (internal quotations omitted).

Under the Hague Convention and ICARA, a district court lacks jurisdiction to decide the merits of an underlying custody claim. Rather, a district court only has jurisdiction to decide whether the child has been wrongfully removed or retained from his or her habitual residence. If the child has been wrongfully removed or retained, the court must order the child be returned to his or her country of habitual residence. "Importantly, the return remedy does not alter the pre-existing allocation of custody rights between parents; the Convention generally leaves ultimate custodial decisions to the courts of the country of habitual residence." Alcala v.

Hernandez, 826 F.3d 161, 169 (4th Cir. 2016). The return remedy "lays venue for the ultimate custody determination in the child's country of habitual residence rather than the country to which the child is abducted." Id. (internal quotations omitted).

To establish a prima facie case under the Hague Convention, the petitioner must show by a preponderance of evidence that 1) the respondent wrongfully removed or retained the child from the place of her habitual residence; 2) the removal or retention breached the petitioner's custody rights, as determined by the law of the place of habitual residence; and 3) petitioner was exercising his parental custody rights at the time the child was wrongfully removed or retained. Miller v. Miller, 240 F.3d 392, 398 (4th Cir. 2001).

"[R]emoval or retention of a child is wrongful when it breaches a person's rights of custody under the law of the [s]tate in which the child was habitually resident." Smedley, 772 F.3d at 186 (internal citations omitted). The Hague Convention does not define the term "habitual residence." Courts analyze a child's habitual residence on a case-by-case basis, taking into consideration: 1) the parent's shared intent, if any to make a particular country the child's home; and 2) "whether enough time has passed for the child to acclimatize to the residence." Id. (internal citations omitted). Habitual residence is not to be confused with domicile, Friedrich v. Friedrich, 983 F.2d 1396, 1400 (6th Cir. 1993), and "a parent cannot create a new habitual residence by wrongfully removing and se-

---

tioner declined to authorize such travel, a reconciliation hearing was held by the Special Court for Children and Adolescents of San Salvador on August 18, 2015. At hearing respondent testified that she would leave El Salvador with the child on September 19, 2015, and would return on October 3, 2015.

**8.** Respondent allegedly changed the travel dates due to conflicting flight schedules. (DE 17 at 8). Respondent and the child entered the United States on a tourist visa, which expired May 1, 2016. (Tr. Day 1, DE 60, 128:5–15).

questering a child." Smedley, 772 F.3d at 186 (internal quotations omitted).

 The Hague Convention specifies that " 'rights of custody' ... include rights relating to the care of a the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5. The Convention "distinguishes rights of access from rights of custody, explaining that rights of access ... include the right to take a child for a limited period of time to a place other than the child's habitual residence." White v. White, 718 F.3d 300, 304 (4th Cir. 2013) (internal quotations omitted). Whenever a "parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child," courts liberally find that a parent was exercising his or her custody rights. Bader v. Kramer, 484 F.3d 666, 671 (4th Cir. 2007) (internal quotations omitted). A parent "who has valid custody rights to a child under the law of the country of the child's habitual residence ... cannot fail to exercise those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." Id. (internal quotations omitted). Once the court "determines the parent exercised custody rights in any manner, [it] should stop—completely avoiding the question whether the parent exercised the custody rights well or badly." Id. (internal quotations omitted).

B. Grave Risk of Harm Affirmative Defense

 Upon a showing of wrongful retention or removal of a child, the court must order return of the child unless the respondent establishes one of the affirmative defenses available under the Hague Convention. Smedley, 772 F.3d at 186–87. "[C]ourts retain discretion to order return even if one of the exceptions is proven."

Miller, 240 F.3d at 402. Respondent in this case has raised the "grave risk" exception pursuant to Article 13(b) of the Hague Convention.

 A court is not bound to order return of a child if the respondent establishes that "there is a grave risk that [the child's return] would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). The grave risk defense is narrowly interpreted, Miller, 240 F.3d at 402, and the respondent bears the burden of establishing its applicability by clear and convincing evidence. 22 U.S.C. § 90003(e)(2)(A). "Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination." Pub. Not. 957, 51 Fed. Reg. at 10510.

 "[T]he grave risk inquiry should be concerned only with the degree of harm that could occur in the immediate future." Gaudin v. Remis, 415 F.3d 1028, 1037 (9th Cir. 2005); see also Alcala v. Hernandez, No. 4:14–CV–04176, 2015 WL 4429425, at *15 (D.S.C. July 20, 2015), aff'd, 826 F.3d 161 (4th Cir. 2016). "Furthermore, the risk of harm must be grave, which is a great deal more than minimal." Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000); see also Friedrich v. Friedrich, 78 F.3d 1060, 1068 (6th Cir. 1996); Nunez–Escudero v. Tice–Menley, 58 F.3d 374, 377 (8th Cir. 1995). "The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes." Van De Sande v. Van De Sande, 431 F.3d 567, 570 (7th Cir. 2005).

 The grave risk defense is applicable in two situations: 1) "where return of the child puts the child in imminent

danger prior to the resolution of the custody dispute—e.g., returning the child to a zone of war, famine, or disease;" and 2) "in cases of serious abuse or neglect, or extraordinary emotional dependence." Friedrich v. Friedrich, 78 F.3d 1060, 1069 (6th Cir. 1996); cf. Miller v. Miller, 240 F.3d 392, 398 (4th Cir. 2001). "For the grave harm [defense] to apply, the respondent must cite specific evidence of potential harm to the child upon his return." Baxter v. Baxter, 423 F.3d 363, 374 (3d Cir. 2005). With regard to the grave risk defense, the Fourth Circuit has recognized that

> courts in the abducted-from country are as ready and able as we are to protect children. If return to a country, or to the custody of a parent in that country, is dangerous, we can expect that country's courts to respond accordingly.... When we trust the court system in the abducted-from country, the vast majority of claims of harm—those that do not rise to the level of gravity required by the Convention—evaporate.

Miller, 240 F.3d at 402 (quoting Friedrich, 78 F.3d at 1068)).

C. Analysis

1. Petitioner's Prima Facie Case

 Petitioner has established a prima facie case for return of the child under the Hague Convention and ICARA. The parties stipulated that El Salvador is the child's country of habitual residence and that petitioner exercised certain rights granted to him by Salvadoran courts at the time the child was removed to the United States. The sole dispute at hearing was whether or not the rights granted to petitioner were rights of custody under Salvadoran law.

At hearing, the court found that petitioner was granted, and exercised, custody rights under Salvadoran law. The court heard expert testimony from Menendez, who spoke to the differences between Salvadoran concepts of parental authority and personal care. Menendez explained that parental authority encompasses parental decisions regarding a child's legal representations and interests. (Tr. Day 1, DE 60, 30:1–3). Parental authority is shared jointly between parents. (Id.). Menendez further testified that personal care involves the custody or daily care of a child. (Id. at 30:4–6).

Under the Salvadoran Family Code, a parent may not unilaterally remove a child from El Salvador. (Id. at 30:6–8). The Law for the Comprehensive Protection of Children and Adolescents ("LEPINA") requires any parent wishing to take his or her child outside El Salvador to obtain authorization from the other parent. (Id. at 31:16–19). Absent such authorization, a parent may only unilaterally remove a child by order from a LEPINA court. (Id. at 31:21–23). Furthermore, when parents are divorced, they share the right to determine the child's residence. (Id. At 32:8–10).

The Second Family Court in San Salvador, El Salvador, granted personal care of the child to respondent by divorce decree issued February 17, 2015. (DE 17–5 at 6; 12). The decree allows petitioner to "have a relationship with the child ..., in a free and unrestricted manner," and grants petitioner open visitation with the child. (Id. at 11–12). On June 18, 2015, the Second Family Court issued an order establishing a schedule of open visitation for petitioner. (DE 17–7 at 1). The order states that petitioner has at the right to at least one day of visitation with his daughter each week. (Id.). The order also requires petitioner to pay a certain amount in child support. (Id. at 2).

Finding no order in the record terminating petitioner's parental authority, the court, upon careful consideration of the

Hague Convention, the Salvadoran Family Code, and the record, finds that petitioner has parental authority, which is a right of custody under the Hague Convention. (Tr. Day 1, DE 60, 85:4–9). Having determined that petitioner established his prima facie case, the court turns to the affirmative defense raised by respondent.

### 2. Respondent's Affirmative Defense

■ Respondent argues that as a result of threats the child's stepfather received from members of the La Mara Salvatrucha, or MS–13 ("MS"), the child would face a grave risk of harm or an otherwise intolerable situation upon return to El Salvador.

As relevant to respondent's affirmative defense, sometime in 2012, respondent and the child moved in with Salinas. (Tr. Day 1, DE 60, 90:1–5).[9] At the time, Salinas was employed as a judicial liaison at the Justice Ministry. (Id. at 90:8–14). In that role, Salinas was responsible for reviewing prisoner case files and interrogating criminal suspects. (Id. at 90:14–18). In February of 2015, Salinas was assigned a case where the criminal defendant was a spokesman for MS. (Id. at 92:7–9). Due to his involvement in the case and refusal to submit to certain requests of the spokesman, MS gang members harassed and threatened Salinas.[10] (Id. at 92:11–93:14).

Salinas was first harassed by members of MS on February 27, 2015. On that date, three MS members approached Salinas as he was leaving work. (Id. at 94:6–22). The men indicated that they worked for the spokesman and asked Salinas to destroy evidence unfavorable to the spokesman's case. (Id. at 94:17–19). When Salinas refused the request, the men told Salinas that they "ha[d] an eye on [him]." (Id. at 94:13–95:4). Following the incident, Salinas spoke to his supervisor and requested a transfer at work. (Id. at 95:6–11). However, Salinas "could not be transferred and maintain [his] position." (Id. at 95:9–11). Because of this, Salinas was not transferred. (Id. at 95:8–11).

On March 7, 2015, respondent was attacked by an unidentified individual, believed to be a member of MS.[11] Around 4:45 a.m. on March 7, 2015, respondent left home for her routine morning jog. (Id. at 95:12–15). While out jogging, an unidentified man attacked, raped, and threatened respondent. (Id. at 95:21–96:4). Following the attack, respondent and Salinas moved to a safer location. (Id. at 96:15–17). Soon thereafter, Salinas began to receive threatening phone calls. (Id. at 96:20–22). Salinas received threatening calls until and through the month of October of 2015. (Id.). The calls were always anonymous and never revealed any specific or person-

---

**9.** At the time respondent and the child moved in with Salinas, the parties were separated. The parties divorced in February of 2015. Salinas and respondent married in May of 2015. (Tr. Day 2, DE 61, 197:2–10).

**10.** Salinas interviewed the spokesman in early February of 2015. (Tr. Day 1, DE 60, 119:11–14). During the interview, the spokesman asked Salinas to borrow his cell phone, a request which Salinas refused. (Id. at 12:15–18). After he spoke with the spokesman, Salinas reported the request to the chief of police. (Id.). When Salinas told the officer about the incident, the chief asked Salinas why the pen

he was holding was different from the one he brought into the interrogation room. (Id. at 119:19–23). At that time, Salinas also told the chief that prisoners were using cell phones in the prison. (Id. at 121:2–23).

**11.** At hearing on April 17, 2017, Salinas testified that respondent's attacker is a member of MS. According to Salinas, when respondent was attacked, her attacker told her that because Salinas did not "collaborate[ ] [or] help [the spokesman], these were the consequences [she would face]." (Tr. Day 1, DE 60, 103:16–18).

al information about Salinas, respondent or the child. (Id. at 96:15–17).

On November 1, 2015, Salinas received an additional phone call from an individual purporting to be a hitman with MS. (Id. at 97:9–10). According to Salinas, the hitman demanded that Salinas pay MS $1,500 and told Salinas that he would "get what[ ] [was] coming to [him]," if he failed to cooperate. (Id. at 97:19–20). The hitman revealed to Salinas that he knew certain details about Salinas's personal life, including the time he left for work, the color of his car, and various details about the child.[12] (Id. at 97:14–20). According to respondent and Salinas, the hitman also told Salinas that he would start a war with Salinas's family. (Id. at 100:8–9; see also Tr. Day 2, DE 61, 211:1–6).

After Salinas received the call, Salinas and respondent reported the incident to the police. (Tr. Day 1, DE 60, 98:4–8). At the time Salinas and respondent filed a police report, an officer examined Salinas's cell phone and determined that the threat came from a number previously traced as coming from a prison or detention facility. (Tr. Day 2, DE 61, 213:6–13; 214:19–24; 215:5–216:7). Within 15 minutes of leaving the police department, Salinas received another threatening phone call. (Tr. Day 1, DE 60, 109:24–110:1). The caller indicated that MS had an informant and knew that Salinas had spoken with police. (Id. at 110:1–4).

On or around November 2, 2015, Salinas, respondent, and the child left for the United States. (Id. at 105:1–9; 106:18–19).[13] The family intended to return to El Salva-

dor on approximately November 18, 2015. (Id.). The family first arrived to the United States in Houston, Texas. (Id. at 105:20–21). On or around November 5, 2015, the family traveled from Houston to Disney World. (Id. At 128:5–7). Sometime after November 5, 2015 and before November 14, 2015, the family traveled to Raleigh, North Carolina. (Id. at 108:5–7).

While the family was away, Salinas and respondent arranged for Salinas's sister to collect mail from the family residence. (Id. 106:1–7). On November 14, 2015, Salinas's sister informed him that someone had broken into his house. (Id. 106:8–17).[14] At that time, Salinas decided not to return to El Salvador. (Tr. Day 2, DE 61, 244:20–25). The couple feared that the break-in was related to the previous threats they had received and were concerned for their safety and the safety of the child. (Tr. Day 1, DE 60, 108:14–109:13).

Respondent fails to establish with clear and convincing evidence that the child will face a grave risk of harm upon return to El Salvador. Respondent contends that the threats Salinas received from members of MS place the child in grave danger of harm.

At hearing, respondent presented evidence that members of MS threatened her family, including the child. From February 27, 2015 through November of 2015, Salinas received numerous threats from members of MS. Notwithstanding the foregoing, Salinas only received one threat which mentioned the child. However, that particular threat did not threaten specific harm

---

**12.** Specifically, the hitman revealed that he knew the child's name and the time Salinas dropped her off and picked her up from kindergarten. (Tr. Day 1, De 60, 97:14–18).

**13.** According to Salinas, this was not a "spur-of-the-moment trip." (Tr. Day 1, DE 60, 104:21–22). The family had been planning to

take the child on a trip to Disney World since December of 2014. (Id. at 104:5–7).

**14.** At hearing, Salinas testified that the house was broken into, notwithstanding the fact that the house was located in a gated community. (Tr. Day 1, DE 60, 107:23–108:1).

or injury to the child.[15] Furthermore, the threat occurred approximately 18 months ago. Respondent offers no evidence that members of MS have targeted, harassed, or otherwise threatened the child since November of 2015. For this reason, the threat Salinas received mentioning the child is insufficient to warrant application of the grave risk defense. See e.g., Simcox v. Simcox, 511 F.3d 594, 609 (6th Cir. 2007) (finding "isolated and sporadic" incidents of abuse as insufficient to warrant application of the grave risk defense).

Threats directed only at respondent and Salinas are likewise insufficient to justify application of the grave risk defense. While the Fourth Circuit has not addressed the issue, evidence of abuse directed only at a parent is generally insufficient to establish a grave risk of harm to the child. See Whallon v. Lynn, 230 F.3d 450, 460 (1st Cir. 2000) (finding the alleged instances of verbal and physical abuse against respondent insufficient to establish the grave risk defense where the child was not similarly abused); Nunez–Escudero v. Tice–Menley, 58 F.3d 374, 376–77 (8th Cir. 1995) (finding physical and sexual abuse against respondent insufficient to grave risk of harm to the child). Ordinarily, evidence of abuse directed at a parent is only sufficient to establish grave risk of harm to the child where a clear pattern of abuse exists. See Walsh v. Walsh, 221 F.3d 204, 220 (1st Cir. 2000) (finding the grave risk of harm to be applicable where evidence established that the petitioner had a clear pattern of engaging in "bloody and severe"

assaults against the respondent). While the court does not discount the seriousness of the threats directed at Salinas and respondent, the threats do not present such a clear pattern of abuse to establish a grave risk of harm to the child.

Respondent also contends that application of the grave risk defense is warranted because returning the child to El Salvador is akin to returning the child to a zone of war. Respondent suggests that the violence and gang activity carried out by MS is similar to that of a war zone. Although respondent offers evidence that the child was threatened, respondent fails to establish that the current situation in El Salvador constitutes a "zone of war." Notwithstanding threats Salinas received from members of MS, respondent offers no evidence that the child is in specific danger living in El Salvador. See Silverman v. Silverman, 338 F.3d 886, 901 (8th Cir. 2003). Rather, evidence presented by respondent tends only to establish that members of MS are known to carry out the threats they make. For example, to support her position, respondent offers expert testimony that members of MS often target individuals under surveillance and have been known to carry out threats of bodily injury within minutes of threats being made. (Tr. Day 1, DE 60, 151:7–10). Respondent also personally testified that El Salvador is not a "safe country" and for "95% of the people that are threatened in El Salvador, the [MS] does fulfill their threat." (Tr. Day 2, DE 61, 219:12–19).[16]

---

15. Salinas received the threat which mentioned the child on November 1, 2015. As noted previously, Salinas and respondent filed a police report regarding the November 1 phone call. The police report did not mention any threat made against the child. (See Res. Ex. 8 (under seal)).

16. In further support of her position, respondent offered into evidence the 2016 Human

Rights Report on El Salvador. At hearing on April 18, 2017, the court provisionally allowed the report into the record without making a ruling on its admissibility. Upon further consideration, the court overrules petitioner's objection to the report. See e.g., Hernandez–Avalos v. Lynch, 784 F.3d 944 (4th Cir. 2015) (finding a 2011 State Department Human Rights Report for El Salvador to be admissible in an asylum case); see also Gonahasa v.

While relevant, such testimony is insufficient to support a finding that the child's situation in El Salvador would constitute a "zone of war," warranting application of the grave risk defense. See Silverman, 338 F.3d at 901 (finding the grave risk exception inapplicable in part because there was no "evidence that the[ ] children [were] in any . . . specific danger living in Israel"). For this reason, respondent's "zone of war" argument fails.

In sum, as declared at hearing and memorialized herein, petitioner has provided sufficient evidence to establish a prima facie case for return of the child under the Hague Convention. Furthermore, application of the grave risk defense is not warranted where respondent fails to provide evidence of specific harm to the child.

## CONCLUSION

For the reasons set forth above, the court finds that return of the child to El Salvador for an adjudication of child custody is appropriate. The court GRANTS petitioner's first amended verified petition. (DE 17). Accordingly, the court hereby AWARDS petitioner physical custody of the child, for the purpose of returning the child to El Salvador, the country of her habitual residence. This order is a determination only of the issues presented to the court under the Hague Convention and ICARA, 42 U.S.C. §§ 11601–11611. This order is not a determination of parental custody or visitation under Salvadoran law.

I.N.S., 181 F.3d 538, 542 (4th Cir. 1999) (allowing a State Department report on country conditions in Uganda into evidence in part because "the inquiry [in question] [was] directly within the expertise of the Department of State"). Notwithstanding the foregoing, the report still fails to establish that the child would face a grave risk of harm upon return to El Salvador. The report describes general regional violence, crime, and government abuse, that threaten everyone in El Salvador.

The clerk is DIRECTED to release and refund to petitioner the $500 bond he posted for entry of the temporary restraining order. Petitioner may file an application for attorney's fees and expenses within 14 days of this order, and respondent shall have 14 days to respond.

An order detailing the terms of the child's return shall be filed contemporaneously herewith.

SO ORDERED, this the 16th day of June, 2017.

See Silverman, 338 F.3d at 901 (finding evidence centered on general regional violence to be insufficient to warrant application of the grave risk defense). While the Fourth Circuit has not addressed the issue, the Eighth Circuit has held that this type of evidence is not sufficient " 'to establish a zone of war' which puts the child[ ] in 'grave risk of physical or psychological harm' under the Convention." Id.